1    <u>**TRANSCRIBED FROM DIGITAL RECORDING**</u>

2              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
3                      EASTERN DIVISION
      DERELL PRUITT, RONALD              )
4     PETERSON, and PLAX HALL           )
      MURDOCK-ALEXANDER, JR., on        )
5     behalf of themselves and other    ) Case No. 16 CV 5079
      similarly situated laborers,      )
6                                        )
                        Plaintiff,       ) Chicago, Illinois
7                                        ) May 1, 2017
      -vs-                               ) 9:20 AM
8                                        )
                                         )
9     PERSONNEL STAFFING GROUP, LLC     )
      d/b/a MVP, THE SEGERDAHL          )
10    CORP., VISUAL PAK COMPANY,        )
      MEDLINE INDUSTRIES, INC.,         )
11    GEORGIA NUT COMPANY, C&D          )
      RECYCLING, LLC and                )
12    METROPOLITAN GRAPHIC ARTS,        )
      INC.,                              )
13                                        )
                        Defendants.      )

14                  TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE SHEILA M. FINNEGAN, MAGISTRATE JUDGE
15
      APPEARANCES:
16
      For the Plaintiff:        WORKERS' LAW OFFICE, PC
17                              BY: MR. CHRISTOPHER J. WILLIAMS
                                53 W. Jackson Boulevard, Suite 701
18                              Chicago, IL 60604

19
      For the Defendant
20    The Segerdahl Corp:       VEDDER PRICE PC
                                BY: MR. JOSEPH K. MULHERIN
21                                  MR. NICHOLAS ANACLERIO, JR.
                                222 North LaSalle Street, Suite 2600
22                              Chicago, IL 60601

23
          **PLEASE NOTIFY OF INCORRECT SPEAKER IDENTIFICATION**
24          NOTE:  FAILURE TO STAND NEAR THE MICROPHONE MAKES
              PORTIONS UNINTELLIGIBLE AND INAUDIBLE
25

```
 1    APPEARANCES:   (Continued)

 2    For Defendant Georgia
      Nut Company:              GORDON & REES, LLP
 3                              BY: MS. LINDSAY A. WATSON
                                One North Franklin Street, Suite 800
 4                              Chicago, IL 60606

 5
      For Defendant Personnel
 6    Staffing Group LLC,
      Visual Pak, C&D Recycling
 7    and Metropolitan Graphic
      Arts:                     KOREY RICHARDSON LLC
 8                              BY: MR. ELLIOT S. RICHARDSON
                                    MS. BRITNEY ZILZ
 9                              20 South Clark Street, Suite 500
                                Chicago, IL 60603
10

11    For Defendant Medline
      Industries, Inc.:         COZEN O'CONNOR
12                              BY: MS. DANIELLE N. HARRIS
                                123 N. Upper Wacker Drive
13                              Chicago, IL 60606

14

15

16

17
      Transcriber:
18
                      SANDRA M. TENNIS, CSR, RPR, RMR, FCRR
19                         Official Court Reporter
                         United States District Court
20               219 South Dearborn Street, Suite 2260
                        Chicago, Illinois  60604
21                     Telephone:  (312) 554-8244
                      Sandra_Tennis@ilnd.uscourts.gov
22

23

24

25
```

1          (Proceedings heard in open court:)

2          THE CLERK:  Case 15 CV 5079, Pruitt et al versus

3   Personnel Staffing Group LLC, et al, here for status on

4   motion.

5          MR. WILLIAMS:  Good morning, your Honor.  Chris

6   Williams here on behalf of plaintiffs.

7          THE COURT:  Good morning.

8          MR. MULHERIN:  Good morning.  John Mulherin on

9   behalf of Segerdahl.  My colleague, Nick Anaclario.

10         MR. ANACLARIO:  Good morning, your Honor.

11         MS. WATSON:  Good morning.  Lindsay Watson on

12  behalf of Georgia Nut Company.

13         MR. RICHARDSON:  Good morning, your Honor.  Elliott

14  Richardson for MVP.

15         MS. ZILZ:  Good morning, your Honor.  Britney Zilz

16  on behalf of Personnel Staffing Group, Visual Pak, C&D

17  Recycling and Metropolitan Graphic Arts.

18         THE COURT:  All right.  I don't know if you saw it

19  but plaintiffs filed a motion to compel.  Sorry.

20         MS. HARRIS:  Danielle Harris on behalf of Medline.

21         THE COURT:  Thank you.  Plaintiffs filed a motion

22  to compel discovery responses.  I'm assuming we're going to

23  set a -- probably a briefing schedule on it.  It looked

24  pretty dense.  I didn't read the whole thing.  Has anybody

25  looked at it yet?

1          MR. RICHARDSON:  Well, your Honor --

2          THE COURT:  Say your name just because we don't

3    have a court --

4          MR. RICHARDSON:  Yes.  Elliot Richardson, and I

5    represent everybody that Ms. Zilz just said.  I sort of

6    abbreviated the MVP.  No, we haven't had -- I haven't had the

7    opportunity to review it, but I would agree that a briefing

8    schedule would be appropriate, your Honor.

9          THE COURT:  Okay.  What's your proposal for when I

10   have a response?  Not have you read it, but it is a discovery

11   motion, so.

12         MR. RICHARDSON:  So there is going to be two

13   aspects to this.  The first is we would need 14 days to

14   respond to the motion to compel.  And we sent Mr. Williams an

15   e-mail as well, and just over the weekend, so I don't expect

16   much absorption of it either.  You know, we're going to be

17   filing a motion for protective order with respect to

18   discovery and asking the Court to exercise some authority in

19   how that --

20         THE COURT:  We being which -- all your --

21         MR. RICHARDSON:  Yeah, all of our defendants.

22         THE COURT:  Yours being not everybody who is

23   standing here, or is everybody standing --

24         MR. RICHARDSON:  I don't know if they're going to

25   join in, or not.  They probably want to look at it first, so,

1    you know, we intend on having that on file on Tuesday.  So if

2    there is an opportunity for those briefing schedules to

3    correspond to one another, it might just make all of the

4    issues a bit more clearer for the Court and bring everything

5    into the forefront.

6            THE COURT:  Tuesday, as in tomorrow?

7            MR. RICHARDSON:  As in tomorrow, correct.

8            MR. WILLIAMS:  Judge, if I may?

9            THE COURT:  Mr. Williams, go ahead.

10           MR. WILLIAMS:  We've had our 37.2 with MVP.

11   Mr. Elliott talked about -- Mr. Richardson talked about that.

12   We haven't seen it yet, but we would -- we indicated we were

13   willing to consider some kind of stronger protection for some

14   of the information that we're seeking.  So if you want to

15   show it to us, if counsel wants to show it to us first, see

16   if we can do it unopposed.

17           MR. RICHARDSON:  Yeah, well, what we did is

18   pursuant to Federal Rule 3C, I think it is, yeah, you know,

19   we've got to confer anyway.  So we're going to put the

20   motion -- so maybe I'm being a little ambitious and should

21   say we will have the brief on file on Wednesday so we can

22   show it to Mr. Williams.  And it does talk about the

23   protections that MVP is asking for, and also, again, some

24   other issues.  Like a sequencing of discovery for the Court

25   to consider.  So we're happy to show it.  In fact, in my

1    e-mail, I indicated we should confer about it. And I think

2    it will absolutely correspond to the issues that are involved

3    in the plaintiff's motion to compel.

4    THE COURT: All right. So can I then just suggest

5    that we set a date by which you will give me a proposed

6    agreed or not agreed briefing schedule on everything?

7    MR. WILLIAMS: That works for us.

8    MR. RICHARDSON: That works for MVP, your Honor.

9    THE COURT: So you're going to file tomorrow.

10   Mr. Williams needs time to look at it. You're going to

11   confer.

12   MR. WILLIAMS: He changed it to Wednesday.

13   MR. RICHARDSON: How about this? Let's give --

14   we're going to spend some quality time together Wednesday on

15   another case as well. Why don't we get this to Mr. Williams,

16   and then I like your idea, if it's okay, on a proposed

17   briefing schedule on both that and the motion to compel,

18   after we've had an opportunity to review the motion to compel

19   that we received this morning and after Mr. Williams had the

20   opportunity to review our motion for a protective order.

21   THE COURT: So you give me a proposed date for when

22   you will file your status report with your proposed briefing

23   schedule.

24   MR. WILLIAMS: Okay. And by Friday, you think

25   you'll file your protective order?

1          MR. RICHARDSON:  I think we'll be all set on both

2     ends --

3          MR. WILLIAMS:  Okay.

4          MR. RICHARDSON:  -- on Friday to know what the

5     briefing schedule is going to look like.  I think, again, we

6     can make them correspond with one another, for the Court's

7     convenience, and just clarity.

8          THE COURT:  So are you suggesting Friday, then?

9          MR. WILLIAMS:  This is what I understand is up to

10    this point, that they're going to show me their proposed

11    protective order and get it on file, agreed or not agreed, by

12    Friday?

13         MR. RICHARDSON:  Fair enough.

14         MR. WILLIAMS:  And on Friday, we will provide you

15    with a joint status report indicating a proposed --

16         MR. RICHARDSON:  Briefing schedule, exactly, for

17    both motions.

18         THE COURT:  All right.  Everybody is on board with

19    that.  Then we're going to take up the -- is there anything

20    else anybody wants to raise before we turn to the pending

21    motion, plaintiffs' motion to quash third-party subpoenas for

22    protective order and for sanctions?

23         MR. RICHARDSON:  Anything else we're going to

24    raise, your Honor, so some of the depositions, the

25    depositions of one of the named plaintiffs and other things,

1   will be included in that motion for a protective order.

2   THE COURT: Then why don't I have you sit down, if

3   you're going to stay, those who don't care. And feel free

4   to -- yeah, you can either argue from the table or you can

5   step up when you're arguing. Who are the new -- is it

6   Mr. Williams and Mr. Mulherin?

7   MR. MULHERIN: Mr. Mulherin and Mr. Anaclario.

8   THE COURT: Okay. Why don't I have you stay up

9   because I have some questions, and it might be easier, but

10  the rest of you can sit down. Yeah, why don't you stay up.

11  It's just hard to see everybody sometimes.

12  All right. So I have some questions. In terms of

13  the -- have any of the third parties who are subpoenaed and

14  are, you know, the subject of the pending motion responded,

15  and what has happened with that material? I thought you had

16  some agreement, but I also see in the reply it asks the order

17  to require the materials to be turned over and destroyed. So

18  just refresh my memory on whether you had some --

19  MR. MULHERIN: Your Honor, so seven of the 16

20  third-party deponents have produced documents. We have

21  provided those to plaintiffs' counsel.

22  THE COURT: All right. So they were --

23  MR. WILLIAMS: The only thing I would add to that,

24  Judge, is I didn't get copies of those documents until at

25  least a week after they received them, and they were used by

1    counsel for Segerdahl in the deposition of Mr. Pruitt without

2    having -- didn't have those documents in hand after that.

3            MR. ANACLERIO:  Your Honor, Nick Anaclerio.  I was

4    at Mr. Pruitt's deposition.  That's false.

5            THE COURT:  Let me ask this question:  Did you have

6    some agreement after the motion was filed as to, if you did

7    get responses, were you allowed to look at them?

8            MR. MULHERIN:  There was an attorneys' eyes only

9    provision, which we abided by.  And then we did produce the

10   documents within 24 hours of Mr. Williams asking for them.

11   And there was no prejudice in relation to Mr. Pruitt's

12   document -- deposition because none of the documents that we

13   received from third-party deponents had anything to do with

14   Mr. Pruitt.

15           THE COURT:  So my second question is, why did

16   Segerdahl, I wrote, jump the gun?  It seemed to me, you know,

17   when you have a subpoena, especially these are sensitive

18   subpoenas that are going out to people.  It's current

19   employers -- or employers that may be seeking employment with

20   again in the future.  If it's a temp agency, it seemed like a

21   very -- it would be one thing if you had a plaintiff who is

22   saying -- just ignoring you not saying I'll be available to

23   talk this evening.  Why were these sent out, you know, by Fed

24   Ex the next day?  It just seemed like you really just wanted

25   to get them out.  And I would think, you know, a more

1    reasonable approach would be to say, you know, here is a

2    deadline because we need to get these out by a certain time,

3    given whatever the schedule is.  And if you don't respond, or

4    you can't make yourself available, or you won't give us any

5    information, we're going to serve them by this date, this

6    time, unless you file a motion for protective order before

7    then.  You know, at least then you can put the onus on the

8    other side.  But, you know, I don't understand why these were

9    rushed out at 8:45, you know, by Fed Ex the next day, given

10   the circumstances here.

11           MR. MULHERIN:  Your Honor, they were not rushed

12   out.  And I think the correspondence between the parties

13   shows that Mr. Williams, he didn't outline any objection to

14   those.  All he said is he wanted to talk.  He certainly

15   didn't say there was a discovery dispute at all.  And I think

16   it's important to take a --

17           THE COURT:  Okay.  Were you surprised -- I mean, of

18   course he is going to have objections.  And now they're

19   outlined in the brief.  I mean, there are always objections

20   to these kind of subpoenas, I think, when you say, let me

21   just subpoena your, you know, current employer, temp agencies

22   you may be applying to in the future and ask for basically

23   all your disciplinary, you know, personnel records,

24   everything.  I mean, your subpoena was drafted broadly

25   enough, it had a catch-all:  Other documents relating to

1   these people.  Of course there are going to be, you know,

2   valid objections to that kind of broad subpoena.

3          MR. MULHERIN:  Well, your Honor, what I would say

4   to that is that, you know, and I think if you read his

5   responses closely, he is not objecting to these types of

6   documents.  In fact, these are the types of documents that he

7   did produce.  He didn't object to the relevance of them.  He

8   did produce -- he did not produce them.

9          THE COURT:  Are you saying in his motion he

10   didn't --

11          MR. MULHERIN:  In his response to discovery.  If

12   you look at his discovery responses, he is not objecting to

13   these types of documents.  He said he didn't have them.  He

14   also said his investigation continues, and he also said that

15   the defendants will likely have some of these documents.  And

16   then once after that -- that representation, he still didn't

17   do any investigation, obviously, so we went and sought those

18   documents.  I think it's important to realize that --

19          THE COURT:  So he had no relevance objection to

20   your going out and getting any disciplinary records for any

21   prior employer?

22          MR. MULHERIN:  He had boilerplate objections in his

23   discovery responses, but he did not outline any specific

24   objections whatsoever.  And, in fact, he represented in

25   response to Plaz Murdock's interrogatories that he didn't

1    have those type of documents.  Why would he -- why would he

2    include that statement if he didn't feel like those documents

3    were relevant?

4              THE COURT:  Okay.

5              MR. MULHERIN:  He specifically says in response to

6    Interrogatory No. 8 --

7              THE COURT:  I mean, obviously in the briefs that I

8    read, they were very specific objections.  You're telling me

9    he didn't -- wasn't specific enough in the general responses

10   or the --

11             MR. MULHERIN:  No, I'm saying he produced those

12   types of documents.

13             MR. WILLIAMS:  Your Honor, this is, frankly, a

14   discovery dispute.  We did have objections to specific

15   requests that were overly broad, particularly the cell phone

16   records.  But those subpoenaed requests, as you point out,

17   are extremely broad.  As I pointed out in my motion -- or in

18   my motion, that day I not only e-mailed them and said I

19   wanted to talk, I know I was available in the evening or

20   earlier the next morning, but I had to actually drive up to

21   Waukegan and find the individuals and talk to them about what

22   was being subpoenaed.  Because I didn't want to say we oppose

23   everything.  I didn't want to say absolutely you can't send

24   out a subpoena.  And, in fact, we don't oppose every single

25   subpoena.  But what they did is they skipped the process of

1    meeting and conferring with us when we had a pending request
2    for 37.2.  We had valid objections to many of these broad,
3    broad discovery requests in our responses to interrogatories.
4    And, you know, to be blunt, if this is the way discovery is
5    to be treated, I have a subpoena that I'd like to put out.  I
6    have conferred with -- MVP objected.  I've conferred with
7    them.  We've held onto it for two weeks, trying to work out,
8    is there another way to get the information based on their
9    objections.  And, in fairness, MVP has a subpoena that they
10   would like to get out, but they conferred with me first.
11   They've held off.  My understanding of the rules and of local
12   37.2 is this is how discovery is supposed to occur.  And as a
13   result, some of this discovery requests, not all, but some of
14   them have caused harm, or at least we -- no one can say
15   whether they've caused more harm or not.  Mr. Pruitt's
16   overtime hours were cut that coincided with the subpoenas
17   being issued.  Now, can I say that it's related to the
18   subpoenas or can they say it's not related?  Nobody knows.
19   Of course, it's a Catch 22.  Do I now send a threatening
20   letter to his current employer saying, we're going to sue you
21   if you took retaliatory.  It's a Catch 22.  And Rule 37.2 is
22   designed to avoid harms.
23             MR. MULHERIN:  Your Honor --
24             THE COURT:  I mean, I have on the timeline is 8:30
25   AM, on March 14 -- first of all, March 13th at 3:08 PM, the

1  defendant e-mails copies of the subpoenas.  At 4:43 PM,

2  plaintiffs e-mail back, hold off pending a 37.2 conference.

3  The next date, 8:30 in the morning, defendant says:

4  Articulate your concerns about the subpoenas.  At 8:55 AM,

5  defendants ask plaintiffs to also say:  When are you

6  available to talk?  5:25 PM, plaintiff says he is available

7  to talk this evening or anytime tomorrow morning.  Ten

8  minutes later defendants ask:  State why do you believe

9  plaintiffs would be justified in moving to quash some or all

10  of these subpoenas and then let's discuss that live.  8:45

11  PM, defendant serves all subpoenas by Fed Ex saying it never

12  received your specific objections to the subpoenas.

13         So that's the timeline.  Why -- why the hurry

14  between 5:25 PM, when he says, I can talk this evening or

15  anytime tomorrow morning, and 8:45 serving the subpoenas?

16              MR. ANACLERIO:  May I address the Court?

17              THE COURT:  Yes.

18              MR. ANACLERIO:  Since I'm the target of a motion

19  for sanctions and since I think that most of what's been

20  presented to you by the plaintiff is hellacious, I'd like to

21  be able to address it.  First of all --

22              THE COURT:  Say your name.

23              MR. ANACLERIO:  Nick Anaclerio.  I represent

24  Segerdahl.

25              THE COURT:  Go ahead.

1      MR. ANACLERIO:  What's been going on here is part

2   of a chronic pattern and practice of obstruction and

3   non-prosecution of this case by the plaintiff.  It wasn't

4   that we were acting precipitously, it was that we were

5   respecting deadlines that the Court had put in place.

6      THE COURT:  Which deadline were you focused on when

7   you had to send it out that night?

8      MR. ANACLERIO:  Well, plaintiffs said they didn't

9   have these documents.  They didn't say, we object to these

10  documents, we're withholding them based on our objections.

11  They said, we don't have these documents.

12     THE COURT:  What specifically are you referring to?

13  Specific responses?

14     MR. ANACLERIO:  I'm talking about

15  employment-related reports.  I'm talking about records that

16  relate to basic facts as to the plaintiffs' job history,

17  performance.  Their fitness as class representatives.  And we

18  got no specific objections to those.  But what's more

19  important to me, Judge, is that Rule 37.2 doesn't mandate

20  that we confer with the plaintiff before issuing a subpoena.

21  What it does mandate under Rule 45 --

22     THE COURT:  Can I tell you this?  I am going to

23  require that you do that from now on, if you're sending out a

24  subpoena to a current employer or a temp agency.

25     MR. ANACLERIO:  If we had been ordered by the Court

1  to do that, we would have done that.

2  THE COURT:  So I will be ordering that right now.

3  MR. ANACLERIO:  If the rules provided for that in

4  advance of a Court order, we would have done that.  Rule 45

5  says they get notice of our subpoena.  Rule 45 doesn't say

6  that we have to meet and confer with them.

7  THE COURT:  Well, you do that at your -- in your

8  own risk, then.  If you send out -- if you send them a notice

9  for a subpoena, for example, I'm going to get all of your

10  medical records for all time, I'm going to ask for -- and

11  they say we object, and you say, I did enough, I gave you

12  notice, you're doing that at your own risk.

13  MR. ANACLERIO:  Respectfully, your Honor, we didn't

14  do that.  Judge Der-Yeghiayan expects this case to be briefed

15  on class certification May 29th.

16  THE COURT:  Whose motion is that?  Whose filing on

17  May 29th?

18  MR. ANACLERIO:  The plaintiff has to file it on

19  May 29th.

20  THE COURT:  When is your response due?

21  MR. ANACLERIO:  Our response is due --

22  MR. MULHERIN:  In July.

23  THE COURT:  Late in July, I think; isn't it?

24  MR. MULHERIN:  We have two months to respond.

25  MR. ANACLERIO:  Your Honor, we haven't even

1    completed the deposition of two plaintiffs so far.

2              THE COURT:  Let's talk about that later.

3              MR. ANACLERIO:  But it's related to this

4    obstruction.

5              THE COURT:  If you have trouble filing -- if you

6    can't get them to agree to a deposition, then file a motion.

7    You can get before me within a couple days, and we will talk

8    about that.  But I'm asking you a very specific question

9    about the timing.  When he says I'm available to talk

10   tomorrow morning, then you could have said, look --

11             MR. ANACLERIO:  Your Honor, respectfully --

12             THE COURT:  -- let's talk tomorrow morning.  You

13   went ahead and filed it.

14             MR. ANACLERIO:  -- what would have differed?  He

15   objects to the subpoenas.  We believe they're appropriate.

16   He says he doesn't have the documents.  He can't produce

17   them.  Our only recourse is to get them through third

18   parties.  Under Rule 45, he gets notice of the subpoenas.

19             THE COURT:  Here is the difference.

20             MR. ANACLERIO:  If he wishes --

21             THE COURT:  You have that meet-and-confer and let's

22   say he agrees to some of it and some of it he doesn't agree

23   to.  And then he says, I'm going to file a motion for

24   protective order and he gets it on file.  And then you come

25   before me, and I might agree that you can't get everything

1    you're asking for for each of these persons.

2            MR. ANACLERIO:  That's the whole purpose of him

3    getting notice of the subpoenas and having the opportunity to

4    do a motion to quash, which is exactly what we're doing.

5            THE COURT:  When?  When was his opportunity to file

6    a motion to quash between the time --

7            MR. ANACLERIO:  He could have filed it as soon as

8    he got the subpoenas, but he waited.

9            THE COURT:  So he shouldn't have had a 37

10   conference with you before filing a motion for a protective

11   order?

12           MR. ANACLERIO:  He has to have a Rule 37 conference

13   before filing a motion.

14           THE COURT:  There you go.

15           MR. ANACLERIO:  We don't have an obligation to

16   file -- to have a Rule 37 conference before issuing a

17   subpoena.  It's just not there, Judge.

18           MR. MULHERIN:  Your Honor, if I may?  I want to

19   bring this back to what his burden was on this motion.  His

20   burden was for him to show harm.  He didn't do it.  And if I

21   could address one thing, it's all guesswork as to whether

22   these folks were harmed because he can't provide any facts.

23   The records that he produced on the day of Mr. Pruitt's

24   deposition relating to his overtime, this supposed overtime,

25   show that his hours were reduced the week before we served

1    the subpoenas.  There is no evidence of harm.  Therefore,

2    everything else is just speculative.  And so that's why the

3    motion should be denied in and of itself.  If I may approach,

4    I would like to give you a copy of this.

5             THE COURT:  I mean, I agree, I think it's

6    speculative.  I don't know how we can pursue this, but I --

7    putting aside that, I'm just concerned about a situation

8    where I have a party saying, I want to confer, I'm available,

9    and that evening the subpoenas go out, and I hear that you

10   have to respond to a motion for cert in late July.  But I

11   think there was time.  And then you could have said to him,

12   if he dragged his feet and he wasn't doing it, you could have

13   said, you either go in on a motion for protective order by

14   this date or the subpoenas are going out.  Put the onus on

15   him.  And then, you know, he is the one who looked bad

16   because he dragged his feet and forced me to get involved in

17   a motion.

18             I want to talk about the specifics of these

19   subpoenas because I think some of it is fine and some of it

20   isn't.  I don't know about harm.  But even if there is no

21   harm, I have to think more about what's appropriate here,

22   where, you know, I think there should have been some

23   opportunity for discussion when he said he has problems with

24   the subpoena.  And I don't think there was any urgency

25   getting them out that night.  Whether Rule 45 requires it or

1  not, maybe you're right.  I'm going to look at it.  I'll look

2  at the cases.  But I'm going to take a close look at that.

3          MR. ANACLERIO:  Your Honor, if we had made the

4  compliance date for those subpoenas shortly after their

5  issuance --

6          THE COURT:  That's not the problem.  The problem is

7  they see the subpoena.  Now they know there -- sued their

8  employer, it's --

9          MR. ANACLERIO:  Your Honor, there are some burdens

10 that attach to being a named plaintiff in a lawsuit.  One of

11 them is the act to respond to relative discovery.

12         THE COURT:  So on your theory, anytime anybody

13 files a case against their employer, the employer can

14 immediately issue third-party subpoenas out to every place

15 they have ever worked, asking for every document related to

16 their employment because maybe I'll find something in there

17 that shows that they were not honest?

18         MR. ANACLERIO:  No.

19         MR. MULHERIN:  Your Honor?

20         THE COURT:  That seems to be what you're saying.

21         MR. ANACLERIO:  That's not what we've done and

22 that's not our position.

23         THE COURT:  Well, it seems to be what you're

24 saying, that there are certain requirements that come being a

25 plaintiff in a lawsuit.

1              MR. MULHERIN:  Your Honor, if I --

2              MR. ANACLERIO:  What I'm saying is that the rules

3    circumscribe what is appropriate and relevant discovery.  Our

4    motion papers -- and we're prepared to argue today why this

5    is.

6              THE COURT:  Let's argue, then.

7              MR. ANACLERIO:  But the rules also address the

8    issue of them having an opportunity to do what they've done,

9    precisely what they've done.

10             THE COURT:  Why not have that happen before the

11   subpoenas go out and potentially cause a harm?

12             MR. ANACLERIO:  If your Honor orders that, then

13   that's an obligation we will adhere to.  It's not part of the

14   rules.

15             THE COURT:  All right.  Let's talk about each of

16   these topics.  Turning to the Pruitt subpoenas, is there a

17   stipulation that he is not seeking damages after the date he

18   was hired at Riverside?

19             MR. MULHERIN:  There was not, your Honor.

20             THE COURT:  Is there now?

21             MR. MULHERIN:  It's not even clear in the amended

22   interrogatory answer either.  If that's a stipulation they

23   want to make, that's fine.  They just didn't make it at the

24   time they filed their motion.

25             THE COURT:  All right.  I mean, I think you need to

1    put in writing and they need to be satisfied that there is no

2    wiggle room on how you're wording it.  But if there is a

3    stipulation that you are -- you think there is no wiggle

4    room, and it's clear, would you agree at this point there is

5    not a need for the current employer's earnings and tax

6    information?

7            MR. MULHERIN:  I'm not very concerned about that.

8    I am concerned about the specific dates on which he was

9    employed, what his employment record has been at his current

10   employer.

11           THE COURT:  Well, we're going to talk about those

12   categories.  But just earnings and tax information, if you

13   get the stipulation that you need, you wouldn't need --

14           MR. MULHERIN:  We'll look at it.

15           THE COURT:  Okay.  And so, can I ask, Mr. Williams,

16   can you get the stipulation that you're offering to them, we

17   can wrap this into the Friday, or whatever, status report

18   you're going to file so I know?

19           MR. WILLIAMS:  Judge, we're scheduled to meet and

20   confer tomorrow on some discovery issues.  We can -- you

21   know, I don't know what it is they're concerned about in our

22   amended interrogatories answers, but that will be an

23   opportunity for them to explain it.

24           THE COURT:  All right.  If you're still at odds,

25   then I just want to know that when you file your status

1    report.

2             MR. WILLIAMS:  We'll let you know on Friday.

3             THE COURT:   In terms of the Pruitt's application

4    materials, it seems to me, given the circumstances here,

5    there is justification for looking at his application

6    materials.

7             MR. WILLIAMS:  Your Honor, we don't object to the

8    application materials for other employers.  I think what we

9    proposed is that the documents that were received be given

10   back to us, and that we produce those documents that are

11   relevant to the opposing side, picking out the --

12            THE COURT:  Now, with Pruitt, I thought the only

13   one we have at issue is his current employer, just the one

14   Riverside.  So when we talk about other employers, are there

15   other employers --

16            MR. WILLIAMS:  The concern, Judge, is that

17   catch-all phrase, and we don't know what --

18            THE COURT:  Oh, that they may have in the Riverside

19   file documents pertaining to other employers?

20            MR. WILLIAMS:  Or a prior Glenkirk file, or

21   something else.  My point, Judge, is there may be nothing

22   that we object to outside of the Riverside.  But if there is

23   something that should not be in the other side's hands

24   because it's not relevant and it's private, or something like

25   that, then we would redact it, and we would advise them.

1    THE COURT:  But I think, given his deposition

2    testimony, the fact that he had failed to disclose Rimland,

3    that he has got this fraud issue with -- for conviction, is

4    it, with a prior employer, that at least it's regarding his

5    application materials, that that would be fair game.

6    MR. WILLIAMS:  I don't disagree with that.

7    THE COURT:  All right.  So I would not let you

8    withhold, for example, in the Riverside files, there are

9    applications from other employers.  That would be produced.

10   I think what you're raising an issue about are the

11   performance and disciplinary records.

12   MR. WILLIAMS:  Yes.  As well as the medical

13   records.

14   THE COURT:  Oh, and medical?

15   MR. MULHERIN:  Your Honor, can I address a few

16   things there?

17   THE COURT:  Yes.

18   MR. MULHERIN:  And I think this will -- this is an

19   important topic because these are topics that Mr. Williams

20   and the plaintiffs have made relevant in the complaint.  They

21   allege that there are no qualifications in temporary work.

22   And I think this relates a little bit more even to the

23   third-party temporary agencies.  But when you make discipline

24   and you make qualifications an allegation in your complaint,

25   then they become relevant.  And we should have the ability to

1    look at the records and determine whether they -- they're

2    good employees and whether, therefore, whether they're good,

3    adequate representatives.  And so I can speak to, you know,

4    some of the records we received from the third parties, they

5    speak directly to this point.

6              THE COURT:  But let me ask you that.  On, for

7    example, Mr. Murdock-Alexander, what is it -- why would you

8    get his disciplinary and performance records?

9              MR. MULHERIN:  Because it shows he is not employed

10   because he doesn't have the ability to stay on a job.

11             THE COURT:  What's your basis for thinking the

12   records are going to show that?

13             MR. MULHERIN:  I know that they show that.  The

14   records that we've received show that he was removed from

15   various jobs because he could not show up for work.  Another

16   one shows that he was removed from a job because he smelled

17   like marijuana, and he was talking behind a stack of pallets.

18   Those are the types of things that would bear on whether

19   someone was an adequate representative.  They also show

20   whether they're qualified.

21             THE COURT:  So what would be the defense here?  So

22   you're saying you -- obviously your client has hired him

23   after this; right?

24             MR. ANACLERIO:  Our clients never hired him.

25             THE COURT:  Okay.  You didn't hire him.  And the

1    theory is why they didn't hire him is because they're not

2    Hispanic.  They were not sent out.  I guess they showed up

3    and they sit in the office and the Hispanic temp employees

4    go.  So they weren't even employed --

5            MR. MULHERIN:  They're temporary labor -- they were

6    temporary labor employees sent by MVP to -- or these other

7    entities to various places.

8            THE COURT:  Okay.

9            MR. MULHERIN:  But you have to remember a big issue

10   in this case is mitigation.

11           THE COURT:  But are you going to say that --

12           MR. MULHERIN:  They have to show mitigation.  And

13   that's related to mitigation as well.

14           THE COURT:  Right.  So let me understand the first

15   argument before we turn to mitigation.  So you're saying

16   these employees were sent by MVP, they're sitting there at

17   your company, and they're not even sent over, and you didn't

18   hire them, not because they weren't Hispanic, but because

19   they were smelling of marijuana, or they just, you know,

20   they're sleeping or they're bad employees?  But you wouldn't

21   have known that, of course.  So that's what I'm trying to

22   understand why it's relevant here.

23           MR. ANACLERIO:  What this goes to, your Honor, is

24   these individuals' ability to remain gainfully employed and

25   earn the wages they're claiming they were wrongfully denied

1   based exclusively upon their race.

2           THE COURT:  So you'd say, even if I had taken them

3   on because I -- even if I had hired them, they wouldn't have

4   been on the job long so their claimed earnings would be less

5   than they are claiming?

6           MR. ANACLERIO:  Well, it goes to that, and it also

7   goes to fitness as class representatives.  Imagine

8   hypothetically --

9           THE COURT:  Well, I guess -- yeah.

10          MR. ANACLERIO:  Imagine hypothetically two

11  potential representative plaintiffs.  One is an individual

12  who regularly shows up on time, is receptive to training,

13  works diligently on the job and has no blemishes on their

14  record that would indicate a lack of honesty and truth and

15  veracity.

16          THE COURT:  They'd have a tough lawsuit to file

17  saying they weren't hired based on race, then; right?

18          MR. ANACLERIO:  That's right.  They would be a

19  great representative plaintiff.

20          THE COURT:  But you didn't have that information;

21  did you?

22          MR. ANACLERIO:  What I'm saying, your Honor, is

23  hypothetically, think about the other putative plaintiff

24  class representative.  With that individual, that purported

25  class representative, he has got a conviction.  He has got a

1   conviction for criminal fraud. A felony. He was sentenced

2   on a plea. He also is somebody --

3            THE COURT: How would that even be admissible?

4            MR. ANACLERIO: It's admissible in the class

5   certification issue because these individuals have to show

6   their fitness to serve as class representatives.

7            THE COURT: Well, I understand if you have a

8   criminal conviction and it goes to your truthfulness, that's

9   a problem. But putting that aside, I'm not sure if you're

10   sleeping on the job why does that -- what's --

11           MR. ANACLERIO: If you or I, your Honor, were part

12   of that putative class --

13            THE COURT: Right.

14           MR. ANACLERIO: -- would we feel equally well

15   represented by the hard worker, the diligent person or the

16   one who is convicted of criminal fraud and thrown off a job

17   smoking marijuana --

18            THE COURT: Put aside --

19           MR. ANACLERIO: -- and being behind a stack of

20   boxes?

21            THE COURT: Put aside fraud. Is there --

22           MR. MULHERIN: It goes to mitigation, your Honor.

23            THE COURT: Right, I mean, I get -- I understand

24   the mitigation argument, maybe. I'm going to hear from

25   Mr. Williams. But I don't understand this employability

1  argument.  So you would say that if -- let's assume there is

2  no fraud conviction.  You've got evidence that before -- long

3  before this happened, you've got an employee who was just, he

4  never held onto a job for long because he is sleeping on the

5  job, he smells bad, I don't know, whatever it is, doesn't

6  follow instructions.  And now you'd say, we get to offer in

7  trial to show that, well, the jury itself -- a juror wouldn't

8  hear it --

9           MR. ANACLERIO:  What I'm saying is, we get to offer

10  at the certification stage the argument that this

11  individual -- and the case law supports this position.  We

12  get to argue that this individual is not a fit class

13  representative because that person is going to have a

14  fiduciary responsibility to the rest of the class.  The rest

15  of the class is going to be measured in part by that person's

16  fitness for work --

17           THE COURT:  Why is that?

18           MR. ANACLERIO:  -- their diligence, the lack

19  thereof.

20           THE COURT:  I don't see that.  Why is the rest of

21  the class going to be met --

22           MR. ANACLERIO:  Because, as class representative of

23  plaintiffs, they have a fiduciary duty to the class.  And the

24  class' ability to prosecute their case is going to be colored

25  favorably or negatively by that individual's background.

1          MR. MULHERIN:  Your Honor, they have to be

2  representative.  They can't be representative if they have

3  individualized defenses against them.

4          THE COURT:  Right.  I was trying to understand what

5  the individualized defense is.

6          MR. MULHERIN:  The individual -- we have to

7  remember, so the third-party employment records that relate

8  to Mr. Murdock, for example, they're records from the --

9  subsequent, from the time that he actually worked at

10  Segerdahl.  So they go to whether he has been mitigating his

11  damages since that point in time in which he worked with us

12  for a cup of coffee.  I mean, they go to whether he is doing

13  his work, his diligence, to mitigate his damages.  You're not

14  doing your work --

15          THE COURT:  I already said I can see possible

16  argument on mitigation, except I want to hear from

17  Mr. Williams and think about it more.  But is there another

18  individualized defense other than mitigation?  Because I hear

19  this employability thing.  Is that the same as mitigation or

20  is that something --

21          MR. MULHERIN:  Well, no.  Well, it's mitigation and

22  it's adequacy.  And I don't think we should take the adequacy

23  representation prong lightly.  You really have to be

24  representative.  You cannot be representative if you are not

25  employable.  If you're someone who is going --

1    THE COURT:  Is there a case on that?  I would like
2    to read it.

3    MR. MULHERIN:  We can look, we can.  But I think
4    it's --

5    THE COURT:  If you're not employable, you're not an
6    adequate class rep?  So you can basically offer anything from
7    before, after, just to show it's a bad employee.

8    MR. MULHERIN:  But you have to remember his
9    allegations.  Again, you have to tie them to the plaintiffs'
10   allegations.  This is a temporary labor agency case.  You
11   know, they're making allegations in their complaint about the
12   agency world and how DNRs are relevant.  And so people
13   aren't -- people aren't terminated, they're DNR.  Well, in
14   Mr. Murdock's case, he wasn't DNR'd from his subsequent job
15   because he was black, he was terminated because he smelled
16   like marijuana and he was sitting behind the pallets talking
17   on the phone.  That type of stuff is relevant.  And I don't
18   see how it wouldn't be for adequacy or mitigation.

19   THE COURT:  Why don't I hear from Mr. Williams.

20   MR. WILLIAMS:  First, your Honor, I would just like
21   to point out, this would have been a good exercise to engage
22   in before the subpoenas were issued, and we could have seen
23   if we could narrow this thing.

24   Second, I just -- I want to make sure, since we are
25   talking about a different kind of industry, that we're using

1    vocabulary that everyone can agree to.  Mr. Anaclerio said

2    that Mr. Murdock never worked for Segerdahl.  Yet,

3    Mr. Mulherin said he worked for us for a cup of coffee.  So

4    they're saying opposite things.  So I just want to be clear.

5    These are a staffing agency making assignments to various

6    client companies, Segerdahl being one of those client

7    companies.  The -- Segerdahl has denied that MVP sends

8    Mr. Murdock to work, even though Mr. Murdock went to the MVP

9    office.  On the check stub, the state law requires they list

10   what agency or what client that you're going to.  On the

11   check stub for the week that Mr. Murdock went to Segerdahl,

12   it says Twin Staffing at the bottom, or Twin at the bottom,

13   which we've come to learn or believe that is Twin Staffing,

14   some kind of agency supported by MVP that provided workers to

15   Segerdahl and is part of the subpoena I was talking about

16   earlier.

17          The reason that this is important is he continued

18   to be assigned out.  So they're alleging -- you know, first

19   of all, we have -- one of the things that we are discussing

20   tomorrow and may be moving to compel is we have not gotten

21   any requirements, prerequisites, job skills, training that

22   any of the client companies or MVP had for any of these jobs.

23   Second, we have not gotten any kind of disqualifications,

24   such as a background check, such as a drug test, such as --

25   we've asked for that.  That's part of our discovery request.

1   They're talking about how all this is relevant, but we don't

2   even know at this point, we'd know from our cases that there

3   are no job requirements in some of the temp staffing

4   industry.  And there are no disqualifying, there is no

5   background check.  So we need to know that.  It goes exactly

6   to the relevance of the information that they're seeking.

7          THE COURT:  What about this idea of the class rep?

8   How can somebody -- you know, first of all, if they have a

9   fraud conviction, that's certainly relevant, and you're not

10  saying that they can't argue that and get that discovery.

11         MR. WILLIAMS:  I'm not saying that.

12         THE COURT:  But what about this employability

13  argument?  Is that something that would be --

14         MR. WILLIAMS:  My point in what I just said, your

15  Honor, is that we have to define what, quote-unquote,

16  "employability" is in this context, in the staffing agency

17  case with client companies and in the MVP case with Segerdahl

18  or other client companies.  Mr. Murdock was continuously

19  sent.  Not frequently, but he was sent on jobs and then

20  stayed until the end of that job.  And the end of that job

21  terminated, and he had experiences where he saw other

22  African-American's jobs being terminated even though the

23  Latino employees were staying.  So we need discovery from

24  them.

25         THE COURT:  So we'll talk about that.  That's going

34

1    to be -- but what about this adequacy of the class rep as

2    being representative?

3            MR. WILLIAMS:  I would like to see what they're

4    relying on.

5            MR. MULHERIN:  I didn't say there was a case, but I

6    did say it is relevant, and I just explained why it was

7    relevant.  He needs to look at his own allegations and see

8    that he did allege allegations relating to DNRs in his other

9    complaints that he has filed, the copycat claims.  He says

10   that African-Americans are DNR'd at a higher rate than

11   Hispanics.  His complaint says that qualifications are

12   relevant.  So whether you can show up to work is clearly a

13   qualification.  Whether you can stay there when you get there

14   is clearly a qualification.

15           MR. ANACLERIO:  Your Honor is familiar with this

16   DNR acronym?

17           THE COURT:  Do not re-hire?  Return?

18           MR. ANACLERIO:  Do Not Return.  So if somebody, for

19   example, is behind a bunch of boxes smoking marijuana and is

20   on a cell phone, they might be asked not to return.  That

21   would be a DNR.

22           MR. WILLIAMS:  And, Judge, what I think would be

23   highly relevant in that situation is to see, under attorneys'

24   eyes only, a designation, personnel files for Latino

25   employees who were sent to see if there are any disciplinary

1   records that were same or similar.

2          MR. MULHERIN:  That's irrelevant.

3          THE COURT:  Okay.  I'm not going to argue, you

4   know, discovery that hasn't even been --

5          MR. WILLIAMS:  They continued to assign him out,

6   that's my point.

7          THE COURT:  So on Mr. Pruitt, you're going to talk

8   about the stipulation that goes to the hearings, the

9   application materials, those are permitted here.  I think

10  you've already acknowledged that.  No?

11         MR. WILLIAMS:  Yes, and --

12         THE COURT:  Okay.

13         MR. WILLIAMS:  -- we would not have opposed that or

14  we would have gotten -- what I suggest is that we get those

15  documents ourselves.  And the subpoenas were out.  What I'm

16  asking is that they give me all the documents, we return

17  those documents that are relevant, in case there are some

18  that are not -- that are not relevant.  We would be happy to

19  give a log of what we didn't return.

20         THE COURT:  I think that might make sense.  I'll

21  let you speak to it.  But, first of all, because I'm not

22  happy with the process here, if we had -- you had come in and

23  argued, I would have had the records go to counsel for the

24  plaintiffs and let him produce what's responsive and what

25  isn't.  You know, he is an officer of the court.  You guys, I

1    think, went ahead and just issued it and now you have them.

2    But I think that should have been the process.  So what's

3    wrong with that, having all the records go back to

4    Mr. Williams and then, pursuant to my rulings, he produces

5    what I order to be produced and doesn't produce anything that

6    I say does not have to be produced?

7              MR. ANACLERIO:  We don't doubt your Honor's

8    authority in any way, shape or form to order that ruling.

9    What we do question, though, is the plaintiffs or any

10   litigant's right to screen discovery based on their own

11   notions of what is and what isn't relevant.  This --

12             THE COURT:  Well, and he is not doing that.  He is

13   going to produce what I order to be produced.  So in the

14   interest of time, do you have any specific objection to my

15   having you give Mr. Williams all the responses to these

16   subpoenas that went out and then have him produce to you

17   whatever I order to be produced?

18             MR. ANACLERIO:  Yes, I do object.

19             THE COURT:  All right.

20             MR. ANACLERIO:  I think it's cumbersome and

21   unnecessary.  We have a protective order in place that amply

22   protects all of his clients' interests.  And that doesn't

23   unnecessarily circumscribe our access to what is relevant

24   information.

25             THE COURT:  Since your access is governed by what

37

1  my rulings are, I'm going to require that you turn over the
2  records to Mr. Williams, and then he'll produce what's
3  relevant.  Of course, you have to maintain it all in case
4  there is some objection to any of my rulings.
5          MR. ANACLERIO:  Are we entitled to retain --
6          THE COURT:  No, you don't retain anything.  You
7  produce all of it to Mr. Williams.
8          MR. ANACLERIO:  We're going to be at a
9  disadvantage, your Honor, in arguing about this to you.
10          THE COURT:  No, you won't because you've seen it
11 and we're arguing right now.  So I will be giving you my
12 rulings.  Mr. Williams will then produce what he has to
13 produce, or not.
14          MR. ANACLERIO:  Well, we don't know what his
15 objections are going to be, so we don't know what our counter
16 would be without access to records.
17          MR. MULHERIN:  Your Honor?
18          THE COURT:  Well, it was fully briefed.
19          MR. ANACLERIO:  I understand that, but I'm saying
20 that --
21          THE COURT:  So I'm going to give my rulings.
22          MR. ANACLERIO:  Your Honor, his objections have
23 also been --
24          THE COURT:  If it turns out you need to see it
25 again, we'll make arrangements for you to see it again.  All

1    right.  Turning to Mr. Peterson.

2              MR. MULHERIN:  It's actually Plaz Murdock's

3    records.

4              MR. ANACLERIO:  That was my mistake, your Honor.

5              THE COURT:  Oh, okay.

6              MR. MULHERIN:  Your Honor, if I may?  This was a

7    topic that was never raised in the Local Rule 37.2.  You

8    know, he did not raise it in the letter.  He also did not

9    raise it when he spoke on the phone.  This was something he

10   added to his motion.  You know, this is something we want

11   regardless of whether we get it through the subpoena.  My

12   understanding is that Mr. Williams has represented to MVP

13   that he will be obtaining these records.  I think at that

14   point we can argue about what is relevant.  Mr. Williams',

15   you know, perspective as to what is relevant is entirely and

16   improperly narrow at this point.

17             THE COURT:  You know, it's always the case with any

18   discovery that you've got attorneys who are looking at things

19   and deciding what's relevant.  We can certainly -- given that

20   you've seen the documents, I don't think there is a fear --

21             MR. MULHERIN:  We haven't seen the phone records.

22   We don't have those.

23             THE COURT:  All right.  We will talk about the

24   phone records in a minute.  But for the other records, you've

25   even seen them, so I don't think there is a fear that there

1    is going to be something in there that he, you know, despite

2    my ruling and just has some different vision of what's

3    relevant or what my ruling is and withholds it.  And if you

4    think he is, you can address that.  But as to the employer --

5    as to the employer records, those are to be produced in whole

6    without anything being retained to Mr. Williams, and then he

7    will produce pursuant to my rulings.

8            MR. MULHERIN:  Your Honor, may we -- may we notify

9    the third-party deponents who Mr. Williams had contacted and

10   tell them to produce the records?  Because my understanding

11   is Mr. Williams made phone calls and stopped some of the

12   third-party deponents from producing the records.  Those

13   records need to be produced.

14           THE COURT:  I think those records should be

15   produced to Mr. Williams.  But you can certainly, by

16   agreement, however process you want to follow, tell them to

17   go ahead and produce the records to Mr. Williams, and then he

18   will, you know, produce as needed, after he gets them so we

19   don't hold those up.

20           MR. ANACLERIO:  Will the plaintiff, then, be

21   obliged to provide a log, for example, as to those documents

22   we've never seen that are going to be produced directly to

23   him?  Because, otherwise, we'll be completely hamstrung.

24           THE COURT:  All right, yes, he has just agreed to

25   do that.  Now, when you said there is a mistake with Peterson

1   what -- are you saying that there is no disagreement as to

2   Peterson?

3               MR. WILLIAMS:  No, your Honor, I said Peterson.  It

4   was a subpoena for Plaz Murdock's cell phone records.

5               THE COURT:  Plaz Murdock, as opposed to

6   Murdock-Alexander?

7               MR. MULHERIN:  Same guy.

8               MR. WILLIAMS:  Plaz Murdock-Alexander.

9               THE COURT:  All right.  So we only have two people?

10              MR. WILLIAMS:  The subpoena for just

11  Mr. Murdock-Alexander.

12              THE COURT:  Okay.  So --

13              MR. WILLIAMS:  I said Mr. Peterson.  I had misread

14  the subpoena.

15              THE COURT:  Okay.  So then we, talking about

16  Mr. Murdock-Alexander, there were five subpoenas to temp

17  agencies.  In terms of mitigation, it seems to me that's a

18  relevant topic, his earnings at these other companies.  There

19  is no disagreement there?

20              MR. WILLIAMS:  There is no disagreement, your

21  Honor.  At this point, the subpoenas are out, so I have no

22  problem having the subpoenaed documents given to us, and then

23  we produce them to defendants.  You know, my concern, though,

24  is how it was done, obviously.  But at this point we have

25  no -- no objection to getting -- Mr. Pruitt, prior to his --

1    the subpoenas going out had, on his own, gone and tried to

2    get, you know, get his employment records and tax records at

3    various locations.  Prior to the subpoenas going out, he was

4    trying to be cooperative.  So -- but I have no -- at this

5    point the subpoenas are out --

6           MR. MULHERIN:  Your Honor, can we address that?  He

7    has been saying that for months.  Where are the records?  We

8    want the records.  You said it in your initial -- in the

9    initial motion.

10          THE COURT:  All right.  Let's move on because I

11   have another case waiting, so we can't take any more time on

12   that.

13          MR. ANACLERIO:  We are continually being promised

14   that plaintiffs is going to get these records, and they don't

15   do it.

16          THE COURT:  Stop.  We're done with that argument.

17   All right.  Let's not rehash everything.

18          On the application materials, what is the -- I

19   mean, now you've seen them, and you're saying that the

20   application materials that you have seen show that he is

21   not -- he doesn't have a fraud conviction or any -- he has no

22   convictions that you know of; right?  What is the argument

23   for why his application materials are relevant here?

24          MR. MULHERIN:  Because it, again, goes to honesty

25   whether they -- whether they were honest in responding to the

1    employment application.

2         THE COURT:  So if you had come in and never seen

3    anything and you just said, we have no idea if he is honest

4    at all, that's why we need to see the records because maybe

5    there will be something in there that will show he is not

6    honest, I would say that's not going to happen.

7         MR. MULHERIN:  Your Honor, from the depositions, it

8    was very clear that his -- the deponents were not being very

9    forthright.  Their answers were inconsistent and --

10   inconsistent with the documents we were aware of and

11   inconsistent with themselves.  The deposition testimony

12   changed from deposition to deposition.  So we have a right to

13   make a clear record of what their employment was.

14        THE COURT:  And what did the application materials

15   show you, now that you've seen them?

16        MR. MULHERIN:  So there are some misrepresentations

17   in terms of criminal history by some of the plaintiffs.

18        THE COURT:  I'm talking about Murdock-Alexander.

19   What did the application documents show you?

20        MR. MULHERIN:  There is a reference to, and I'm

21   blanking on it, but there -- well, there should be a couple

22   things.  With regard to the employment history, it should be

23   clear when they worked at each place and the dates on, you

24   know, when they worked at those places.  There should also be

25   a clear reference to why they left that place of employment.

1    Secondly, there also should be a clear and honest

2    representation of what their criminal history was.  I think,

3    again, that's relevant if you think about adequacy of

4    representation.

5              THE COURT:  But he has no criminal history and the

6    records -- the applications reflect that?

7              MR. MULHERIN:  He has a -- he has a relatively

8    significant criminal history, but they don't represent all of

9    the convictions.

10             THE COURT:  What is Murdock-Alexander's criminal

11   history?

12             MR. MULHERIN:  I believe he has -- we didn't

13   include that in the motion, but I believe it's aggravated

14   robbery; is that correct?

15             MR. ANACLERIO:  There is also, your Honor, just an

16   issue about accurate chronology.  If you look at the

17   plaintiffs' responses to interrogatories --

18             THE COURT:  I think that's accurate.  I mean, he

19   just gave a good argument for why the application would show

20   some information that would be relevant, given their lack of

21   memory.

22             MR. WILLIAMS:  Judge, we didn't oppose that.  We

23   don't oppose that.  For example, Mr. Pruitt was able to find

24   some files that helped him remember the order of events.

25             THE COURT:  All right.  So let's turn to the

1  performance and disciplinary records.  Do you oppose the

2  performance and disciplinary records?

3       MR. WILLIAMS:  I don't, your Honor.

4       THE COURT:  Okay.  So now we just turn to the cell

5  phone records.  And what is the relevance of the cell phone

6  records, other than as they relate to MVP and work force?

7       MR. MULHERIN:  I mean, I think it can be narrowly

8  tailored for that.  But you have to remember, he also needed

9  to mitigate his damages with regard to other employers.  So

10 he would be required to give us the numbers of the other

11 employers, or we could look them up themselves.  If he truly

12 was mitigating his damages in the temporary labor world, he

13 would have been calling in various places every day to get

14 work, or he would have been receiving calls from them.  So

15 it's not just about MVP, it's about other employers.  And the

16 idea is this is an individual who has -- works for four or

17 five temporary labor agencies, so he should have been calling

18 them.  He should have been receiving calls from them.

19      MR. ANACLERIO:  The context is significant in

20 itself, to the extent that, for example, you see a lot of

21 cell phone activity, none of which entails any effort to get

22 employment for a temporary staff agency, for MVP, for any

23 other employment.

24      THE COURT:  All right.  Mr. Williams, what's your

25 response?

1  MR. WILLIAMS:  Your Honor, we told counsel that we

2  didn't -- we didn't disagree that some of the records are

3  relevant.  But just as they said, this is not just about MVP,

4  it's about other employers; it's not just about Mr. Pruitt,

5  it's about other employees.  So we actually agreed that the

6  phone record between MVP and the plaintiffs and MVP and other

7  laborers in their database, whether they be Latino or black

8  or other race, is highly relevant because we know in this

9  industry, and as pled in the complaint, that the job

10  assignments are, if not majority, are filled by making

11  affirmative phone calls from a staffing agency to a pool of

12  laborers.  Many of them are.  And so the records of who

13  they're calling, if there is a pattern of records, if we only

14  call these names, that's highly relevant.  If they're calling

15  Mr. Murdock, that's relevant.  We don't disagree with that.

16  If Mr. Murdock is calling them, that's relevant.  We did not

17  disagree with that.

18  Again, the issue here is why should all of his cell

19  phone records go to the defendant?  If -- if they assert that

20  Mr. Murdock didn't -- didn't mitigate his damages in any way,

21  there is a discovery request there.  If we get the phone

22  records, we can look and see if he can provide those.

23  THE COURT:  So you would get the cell phone

24  records, they would tell you to identify -- produce any phone

25  calls made to, you know, whatever numbers you can identify,

1    staffing companies, and then you'll -- maybe there were none,

2    and then it's going to be bad.  They will argue that shows

3    you're not trying to get work, or there will be, but they

4    don't need to see calls that were made to other than staffing

5    companies.

6              MR. MULHERIN:  Your Honor, I --

7              MR. WILLIAMS:  The only thing I would say, your

8    Honor, I believe in terms of his calls to and from the MVP

9    office, there is a less burdensome and a more relevant way to

10   get it, which is to get it not just from Mr. Murdock but get

11   it from MVP or who they are using to fill assignments.

12             THE COURT:  So that's your discovery that you're

13   talking about.

14             MR. WILLIAMS:  That's right.

15             THE COURT:  I'm guessing.

16             MR. ANACLERIO:  As to our discovery, I think we're

17   entitled to ask him, for example, you made 50 calls that day,

18   but none of them seemed to have anything to do with seeking

19   employment.

20             THE COURT:  All right.  So, well, you're not going

21   to get every phone and reverse engineer and dial every

22   number.  I am going to have the records go to Mr. Williams,

23   and then you can decide how you want to ask for it.  If you

24   want to give him numbers, or -- but I don't think you get

25   every single, you know --

1      MR. MULHERIN:  But I think we can get what we need

2   if we can see that he was making calls to non-entities during

3   the workday.  Because you have to remember, the records we

4   show show that he was terminated for being on his cell phone.

5   So, again, I think they go to his performance.  But we can

6   work on what he'll redact and what he won't redact.

7      THE COURT:  I mean, I don't know what days he was

8   working.  And so if he is not working --

9      MR. WILLIAMS:  The other thing, Judge, is we're

10  going into a slippery slope with what Mr. Anaclario said.  If

11  he made a lot of calls that day, I think then it would be

12  relevant what every other laborer at MVP, who they were

13  calling that day.  It's very normal, if you're sitting there,

14  waiting for an assignment, we never alleged that they were

15  told they could not make a phone call while sitting there.

16  They could probably play a game on their phone.  They could

17  probably do any number of things.  But then, I mean, we would

18  be entitled to broad discovery on that as well to see if

19  that --

20     THE COURT:  Well, we'll cross that bridge if we

21  get --

22     MR. ANACLERIO:  We're not --

23     THE COURT:  Well, you might be.

24     MR. ANACLERIO:  We may be, Judge.  But, right now,

25  we're here on a motion for sanctions to quash.

1     THE COURT:  All right.  So the ruling on the cell
2  phone records is the records -- and is that one where the
3  subpoena went out, the records haven't been produced yet.  So
4  collaborate, let that company know to produce the records to
5  Mr. Williams, and then --

6     MR. MULHERIN:  Mr. Williams needs to contact them
7  because he contacted them.

8     THE COURT:  So you will contact them, have them
9  produce them to you.  If you need them to verify that with
10 opposing counsel, they can do that.  And then why don't you
11 confer.  It seems to me you will have agreement at least on
12 the -- of course the MVP calls are all relevant.  If you've
13 got other staffing agencies to show whether he is trying to
14 get work or not.  And beyond that, you know, you can confer,
15 and if you have disagreement, you can come back to me.

16     All right.  So on unsealing, you have a lot of
17 things redacted here that probably shouldn't be redacted or
18 can't be redacted.  So I would ask you, Mr. Williams, to take
19 a look at this and see.  I mean, some of this is probably
20 going to be out in the trial anyway.  You know, I have the
21 word criminal background redacted.  So if the next time
22 you're before me, I'm going to want you to tell me what you
23 really think needs to be redacted and whether it can be
24 redacted consistent with the Seventh Circuit case law and
25 what is allowed to be sealed and not sealed.  Once I rely on

1    it and use it to make a decision, it sort of changes things.

2    All right.  Is there anything else other than setting a date

3    to come back?

4              MR. ANACLERIO:  We would ask, your Honor, to

5    expedite all of what you've ordered to be done today with

6    respect to the examination and turnover of logs and the

7    turnover of records because we've only deposed one plaintiff

8    fully.  Mr. Pruitt has given possibly two-thirds of a

9    deposition.  He has had --

10             THE COURT:  Well, here.  I'm going to grant that

11   request.  With respect to the employment records, I don't

12   know how voluminous they are, let's say within ten days of

13   receipt you produce back what you're producing back.  The

14   cell phones, can I -- that might take more time because

15   you've got to go through them.  They might be voluminous.

16   Let's just say -- why don't we say seven business days for

17   the employment records and 14 for the cell phone records.

18             MR. WILLIAMS:  Okay.

19             THE COURT:  All right.  Any other business?  Okay.

20   Thank you.

21             MR. WILLIAMS:  Thank you, your Honor.

22             THE COURT:  Oh, let's look at our calendars.

23             MS. ZILZ:  Your Honor?  Just one note for purposes

24   of -- to the extent that you are taking this motion under

25   consideration, I would just like to add with respect to

1  Mr. Murdock --

2           THE COURT:  State your name for the record.

3           MS. ZILZ:  Britney Zilz, your Honor, on behalf of

4  MVP.  With respect to Mr. Murdock and Mr. Pruitt, to some

5  degrees it has been discussed that you are taking this under

6  consideration.  I would just like to add that the harm to

7  these plaintiffs is minimal, given the fact that, with

8  respect to the other staffing agencies that they alleged they

9  would be seeking future employment with, they have actually

10  sued, your Honor.

11          THE COURT:  Oh, they have?

12          MS. ZILZ:  In other cases.

13          MR. WILLIAMS:  Not all of them.

14          THE COURT:  Not all of them?

15          MS. ZILZ:  So Mr. Murdock has sued four other

16  staffing agencies.  I know, I represent two of them -- or,

17  sorry, three other staffing agencies.  I know because I do

18  represent two of them.  Mr. Murdock has also filed suit

19  against another staffing agency.  Again, I do represent that

20  staffing agency in that case, so I am aware of the cases of

21  what's going on in them.

22          Additionally, your Honor, with respect to the phone

23  records for MVP and plaintiffs' representations, I disagree

24  with most of what he has said.  In fact -- especially given

25  the fact that he is saying the burden would be less on MVP,

1    even though the records may be more voluminous.  We do have

2    objections to that which would need to be resolved prior to

3    any sort of resolution of Mr. Williams' objections.

4              THE COURT:  Wait.  Let me understand that.

5              MR. WILLIAMS:  That's all in the motions, your

6    Honor.

7              THE COURT:  In your new motion?

8              MR. WILLIAMS:  Yes.

9              MR. ZILZ:  The motion that he filed after we

10   requested a 37.2, which is ironic, given most of his

11   arguments today, so.

12             THE COURT:  But you're not talking about in

13   relation to the cell phone records here.

14             MR. ZILZ:  We agree that Mr. Murdock's cell phone

15   records are relevant and certainly should be produced.

16   Mr. Williams has said that the only way that he will produce

17   those records to us is if we provide him with every number

18   that MVP has used over the past number of years, no matter

19   whether they are dispatcher cell phone numbers, the office

20   number, all sorts of different records, and then he would

21   redact all of the other calls and would not agree to provide

22   everything else.  So I do want that --

23             MR. WILLIAMS:  Your Honor, those are misstatements.

24             THE COURT:  In any event --

25             MR. WILLIAMS:  If you order me to produce

1    something, I'm going to produce it.

2    THE COURT:  Okay.  All right.  So noted.  Thank

3    you.  All right.  If you have your calendars open.  And today

4    is May 1st.  Just to have a date on the calendar, how about

5    Friday, June 2nd, at 11:00?  Or let's say 10:45.

6    MR. WILLIAMS:  Your Honor, they have a deposition

7    with the plaintiff, MVP counsel, that day.

8    THE COURT:  Oh, okay.  How about the 1st?  June 1st

9    at 10:45?

10   MR. MULHERIN:  I'm giving a presentation that day,

11   your Honor.

12   MR. ANACLERIO:  I am too.

13   THE COURT:  Do you want to go a day earlier, or do

14   you want me to push it back?

15   MR. MULHERIN:  That's Memorial Day.

16   THE COURT:  Oh, that's right.

17   MR. MULHERIN:  Oh, I'm sorry, that was the next one

18   on my calendar, but, yeah, I could go the day prior.

19   MR. ANACLERIO:  Wednesday the 31st, Judge?

20   THE COURT:  Uh-huh.  10:30?

21   MR. WILLIAMS:  That works.  Does that work for

22   other counsel?

23   THE COURT:  Does that work for everybody?  Okay.

24   All right.  So May 31 at 10:30.  If you by some miracle have

25   an agreement, we really don't need it, we should just reset

1   it, let me know.  Thank you.

2          MR. ANACLERIO:  Your Honor, is the motion for

3   sanctions denied?

4          THE COURT:  No, it's taken under advisement.

5          MR. ANACLERIO:  Okay.

6          MR. MULHERIN:  Your Honor, please let us know if

7   you want additional authority for that.  We obviously think

8   it's baseless.

9          THE COURT:  Right.  I did ask you for case on that

10  one point.

11         MR. MULHERIN:  And that may be a novel argument

12  that but I think really fits into this case.

13         THE COURT:  But if you have a case, send it.  If

14  you don't have one, that's fine.

15         MR. MULHERIN:  I think some of the cases that we

16  gave you speak to the -- speak to the appropriateness of what

17  we've sought, and I think we have a string cite of, you know,

18  10 cases, or so.

19         THE COURT:  Okay.  All right.

20         MR. MULHERIN:  Thank you.

21      (Which were all the proceedings heard.)

22

23

24

25

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitations of using a digital-recording system.


*/s/Sandra M. Tennis*                    May 11, 2017

_____          _____
Sandra M. Tennis                         Date
Official Court Reporter